(C. D. 1266)

SUN RICH BEVERAGE CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 9, 1950)

*Wallace & Schwartz; Barnes, Richardson & Colburn (Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Richard H. Welsh* and *Dorothy C. Bennett,* special attorneys), for the defendant.

BEFORE CLINE, EKWALL, AND JOHNSON, JUDGES

EKWALL, Judge: This case is directed against the action of the collector of customs at the port of Chicago in assessing duty upon items described on the invoice as follows:

> 125 cases, each containing 6 number 10 tins syrup,
>   pineapple flavor, "Reinado" brand
>
> 500 cases, each containing 6 number 10 tins syrup,
>   pineapple flavor, "San Cristobal" brand
>
> 771 cases, each containing 6 number 10 tins syrup,
>   pineapple flavor, "Sun Rich" brand

The collector classified the same under the provision in paragraph 806 (a) of the Tariff Act of 1930, as modified by the British Trade Agreement (T. D. 49753), as "fruit juices and fruit sirups, not specially provided for" and duty was assessed thereon at the rate of 35 per centum ad valorem, less the 20 per centum Cuban treaty preferential, as a product of Cuba. Internal revenue tax was also assessed but this tax was not disputed at the hearing nor in the brief filed on behalf of the plaintiff.

It is contended on behalf of the plaintiff that the commodity is neither fruit juice nor fruit sirup, but is properly dutiable as a sugar sirup under the provisions of paragraph 502 of the said tariff act, as modified by the Supplemental Cuban Trade Agreement (T. D. 50541), at $0.001 per gallon and $0.0011 for each per centum of total sugars over 48 per centum and fractions of a per centum in proportion. Plaintiff makes a number of alternative claims which counsel stated at the trial were not waived or abandoned. However, they were not mentioned in the brief.

The Government contends that the case of *United States* v. *Olavarria & Co., Inc.,* 37 C. C. P. A. (Customs) 40, C. A. D. 417, cited by plaintiff as authority for its contention, has no application here and that the classification and assessment made by the collector are correct.

For convenience of reference, we set out the applicable portions of the statute as follows:

PAR. 806. (a) [as modified by the British Trade Agreement, T. D. 49753, effective January 1, 1939] Cherry juice, prune juice, or prune wine, and all other fruit juices and fruit sirups, not specially provided for, containing less than one-half of 1 per centum of alcohol, 35 cents per gallon.

PAR. 502 [as modified by the Supplemental Cuban Trade Agreement, T. D. 50541, effective January 5, 1942].

| Tariff Act of 1930; paragraph | Description of articles | Maximum rates of duty. Specific rates in United States dollars |
|---|---|---|
| 502 | Molasses and sugar sirups, not specially provided for: Testing not above 48 per centum total sugars. Testing above 48 per centum total sugars. | 0.001 per gal. 0.0011 additional for each per centum of total sugars and fractions of a per centum in proportion. |

Three witnesses were produced on the part of the plaintiff, i. e., the manager of the plaintiff firm, the Government chemist who analyzed a representative sample of the merchandise before us, and the customs examiner who made the advisory classification.

The manner of production of this merchandise in Cuba, as disclosed by the evidence, is as follows. At the San Cristobal plant of the manufacturer, which is a very large plant and employs over a thousand people, "The women cut these pineapples with knives and trim them on a table that is slanted towards the operator; on the edge of that table was troughs, and those troughs run out to a pipe, and that pipe ran out to the creek and lost the juice, and that is where I got my idea of using juice and distilled water, because I didn't want to haul the water so far." The importing firm manufactures maple and chocolate sirups and concentrated bases for orange, grape, grapefruit, etc., beverages for bottlers. There is no difference between the three brands imported except that the "Sun Rich" brand is slightly darker in color and is a little better quality of sugar. This appears from the testimony of the manager of the plaintiff firm who had observed the method of production in Cuba. From the testimony of this witness, it further appeared that his firm sold some of the instant shipment in Chicago and shipped the balance to a creamery company in Abilene, Kans., which company warehoused it for him. About one-third of the warehouse lot was used by the Jo-Mar Dairies in Salina, Kans., though he had no personal knowledge of how it used same. The balance of the warehouse quantity was later returned to the importing firm who then sold about 400 cases and used the remainder themselves for sweetening, because of the fact that sugar was not available, and for manufacturing beverage bases for bottlers. The importing firm makes imitation maple sirup, chocolate sirup, and beverage bases such as orange, grapefruit, etc., for bottlers. It was admitted by the testimony of this witness that the strong pineapple flavor of the imported product affected the products his firm manufactures. We quote from his testimony as follows:

Q. Well, did the pineapple flavor affect the products which you made?— A. Yes, it did. We had to offset it with flavoring.

Q. Why?—A. Excess flavoring—because we didn't want pineapple to be tasted in maple syrup, for instance.

\*    \*    \*    \*    \*    \*    \*

X Q. All of these syrups that are now before the court contained a substantial amount of pineapple flavoring, did they not?—A. That is right.

X Q. Now, how did you offset and get rid of the pineapple flavor?—A. Maple syrup we just had to add more maple flavor.

X Q. What do you mean, more maple flavor?—A. We have a formula that we use for making maple-flavored syrup out of simple syrup. When using this we had to use enough additional maple flavoring to kill the pineapple.

The chief chemist at the Government's laboratory at Chicago testified as to his analysis of a representative sample of the merchandise in suit. As a result of this analysis, he found it to be a pineapple-flavored sirup, containing 71.63 per centum total sugars. He did not determine how much of this amount consisted of the sugars present in the pineapple juice and how much was added sugars. He stated that the mixture polarized at 65.62 sugar degrees. He could make no determination of the amount of pineapple juice in the mixture from the sample analyzed. From the polariscopic reading, he determined that there were 64.71 per centum sucrose and 6.92 per centum invert sugar. The sample as removed from the can was a light yellow sirup with a lot of sugar that had been precipitated out and formed a hardened cake in the bottom of the can, and said sample had a strong pineapple taste.

The Government examiner in the office of the appraiser at Chicago stated that he returned the merchandise as a fruit sirup. It is noted that the red-ink advisory return on the invoice reads "fruit juices or syrups n. s. p. f." The examiner stated that his reason for so returning the merchandise was based upon the sugar statement attached to the invoice which indicated that the product contained a percentage of sugar in excess of 65 per centum, and fruit sirup is commonly understood in the trade in this country as a mixture of sugar and fruit juices containing over 65 per centum sugar and under 35 per centum fruit juices. He further testified that he relied on statements attached to the invoice and also upon the laboratory report of the analysis; that such statements indicated that 1,000 tins such as exhibits 1 and 2 contained 6,667 pounds of sugar costing 5 cents per pound, and 1,667 pounds of pineapple juice costing 10 cents per pound, to which had been added as a preservative 33 pounds of benzoate of soda costing 25¼ cents per pound. On cross-examination, he testified that he examined samples of all of the merchandise on the invoice and found no substantial difference between the three items in question.

An examination of the official papers shows that the certification of

the Cuban manufacturer as to the quantities and costs of the component materials used in producing the three types of commodities here involved corresponds with the testimony of the customs examiner.

No witnesses were produced on behalf of the Government for the reason, as stated in the Government brief, that the defendant does not dispute the statements made by the two Government officials in their testimony.

Prior to the enactment of the Tariff Act of 1909, we find no provision for fruit sirups. The Tariff Act of 1897, paragraph 299, provided for the following:

299. Cherry juice and prune juice, or prune wine, and other fruit juices not specially provided for in this Act, containing no alcohol or not more than eighteen per centum of alcohol, sixty cents per gallon; * * *.

Similar provisions were contained in the earlier Tariff Acts of 1883, 1890, and 1894. Under those paragraphs, the earlier decisions of the courts held fruit sirups to be dutiable as fruit juices by similitude but later decisions disapproved that classification and held fruit juices fell within the purview of the provision for nonenumerated articles. In order to remedy this situation, when the Tariff Act of 1909 was in course of preparation, it was recommended to the House Ways and Means Committee that a specific provision for fruit sirups be included either in the fruit juice paragraph (299 above set forth) or in the schedule pertaining to fruits. (See Tariff Revision Notes, 1909, page 369.) In line with this suggestion, Congress provided a specific provision for fruit sirups in the fruit juice paragraph, so that it read as follows:

310. Cherry juice and prune juice, or prune wine, and other fruit juices, and fruit sirup, not specially provided for in this section, containing no alcohol or not more than eighteen per centum of alcohol, seventy cents per gallon; * * *.

By this change in language Congress indicated an intent to levy the same rate of duty on fruit sirups as that applicable to fruit juices.

The Tariff Act of 1913 reenacted the provision for fruit juices and fruit sirup using identical language. (Paragraph 247, Tariff Act of 1913.) However, when the Tariff Act of 1922 was enacted, the provision was enlarged by the addition of the word "all" before the phrase "other fruit juices" and the omission of the limiting term "in this section." The paragraph then read as follows:

PAR. 806. Cherry juice, prune juice, or prune wine, and all other fruit juices and fruit sirups, not specially provided for, containing less than one-half of 1 per centum of alcohol, 70 cents per gallon; * * *.

The paragraph was thus broadened to embrace not only fruit juices and fruit sirups that were not specially provided for in that section, but "all" other fruit juices and fruit sirups not specially provided for elsewhere in the act. That Congress was aware in enacting this provision that fruit sirups are made by mixing sugar

with fruit is established by the following excerpt from Summary of Tariff Information, 1921, page 833:

*Description and uses.*—Cherry juice and other fruit juices are obtained by pressing or crushing the fresh fruit; the sirups are made by mixing sugar with the fruit. Nonalcoholic juices or combinations of them, and especially grape juice, are widely used as beverages, fruit sirups and crushed fruits in flavoring soda water and other "soft drinks" and confections. * * *

Congress reenacted in paragraph 806 (a) of the Tariff Act of 1930 the fruit juice and sirup provision in identical language to that used in paragraph 806 above set forth. The British Trade Agreement (T. D. 49753) made no changes in the provision except a change in rate. From the Tariff Commission report on paragraph 806 (a), *supra*, prepared for use in connection with the British Trade Agreement, it is plain that the high contracting parties were aware that said trade agreement provision would include "pineapple juice, natural and condensed." We quote from page 8-18 as follows:

*Description and uses*

Included in this import classification are a wide variety of specialty products used as beverages or as flavoring for foods and beverages. Among the items disclosed by an import analysis were the following: Russet apple juice; apricot juice natural and condensed; banana juice, condensed; cassis juice; cherry juice natural and condensed; red currant juice natural and condensed; black currant juice; cherry sirup; lemon juice; moose berry juice; Jaff-orange juice; passion fruit juice; grapefruit squash; *pineapple juice, natural and condensed*; prune juice, condensed; quince juice; raspberry juice, natural and condensed; and strawberry juice, natural and condensed. [Italics supplied.]

From this legislative history it is plain that Congress intended to impose the same rate of duty on fruit sirups as on fruit juices—this with full knowledge that fruit sirups may be obtained by mixing sugar with the natural fruit juices.

Plaintiff contends in the brief filed that only products similar to those involved in the cases of *Marrash Bros.* v. *United States*, 22 Treas. Dec. 448, T. D. 32332, G. A. 7341, and *Amerman & Patterson* v. *United States*, 32 Treas. Dec. 347, T. D. 37099, G. A. 8047, are dutiable under the provision for fruit sirups, and that the merchandise before us is excluded therefrom because it is not shown to have been made by concentrating pineapple juice, or by any process of evaporation or condensation. We find nothing in either of the cited cases to indicate that the tariff provision for "fruit sirups" should be limited to those made by any particular process. The *Marrash* case involved a product described as "a thick sirup or molasses, made by boiling or cooking the juice of grapes," with some added yeast. It was claimed to be dutiable under paragraph 216 of the Tariff Act of 1909 as molasses. The importer there, as here, sought classification under the molasses and sugar schedule. That claim was overruled and the merchandise was held to be more specifically provided for as a fruit sirup under

paragraph 310 of that act. In the *Amerman & Patterson* case, *supra*, which arose under the Tariff Act of 1913, the merchandise was described as a "sirupy substance of a reddish-brown color" which was shown to be "an extract from the grape." It was claimed dutiable under paragraph 49 of that act as a flavoring extract. That claim was overruled and the commodity held classifiable as a fruit sirup.

Other cases which arose under the Tariff Act of 1913 involved the classification of raspberry sirup in various forms. See *Ross* v. *United States*, 21 Treas. Dec. 159, Abstract 26348; *Park & Tilford* v. *United States*, id. 169, Abstract 26397; and *S. S. Pierce* v. *United States*, 29 Treas. Dec. 575, Abstract 38851. The commodities there involved were described as raspberry juice boiled with sugar, a thick raspberry sirup, and raspberry shrub, respectively. All of the merchandise was held to be dutiable as "fruit sirup."

Plaintiff relies upon the case of *United States* v. *Olavarria & Co., Inc.*, 37 C. C. P. A. (Customs) 40, C. A. D. 417, as supporting its claim that the instant commodity is a sugar sirup under paragraph 502, as modified, *supra*. In this connection, plaintiff states that the court in the cited case held that sugar sirups are "saturated solutions" used for purposes other than the refining of sugar. The court held in that case that a product, consisting of a mixture of sugar and water to which a negligible amount of artificial vanilla and/or mapleine flavoring had been added, was properly dutiable as a sugar sirup. In the course of the decision, the court cited the case of *Cresca Co. (Inc.)* v. *United States*, 15 Ct. Cust. Appls. 105, T. D. 42185, in which sugar sirup was defined as "a saturated solution of sugar in water," and held that the artificial flavoring which had been added to the product there involved was insignificant and did not affect its use in the same manner as unflavored simple sirup. A similar definition of sugar sirup was given in the case of *Savannah Sugar Refining Corp.* v. *United States*, 20 C. C. P. A. (Customs) 272, T. D. 46061. The court does not understand from the record that the instant commodity contained any water. The description given in the record is, "they dissolved their sugar in pineapple juice that was going as a waste in this plant, and canned it and Pasteurized it; that is all." This agrees with the certified statement of the foreign manufacturer, attached to the invoice, that the product imported consists only of cane sugar, pineapple juice, and benzoate of soda. In this certification the exact quantity of each of these three ingredients is given. Had the importation contained water, the manufacturer would have been required to so certify and to state the quantity thereof.

So far as the record shows we have before us natural pineapple juice as a basic ingredient in a substantial quantity, to which has been added cane sugar, together with a preservative. Fruit juice plus cane sugar equals fruit sirup. Therefore, the classification of the collector

under the specific provision therefor in paragraph 806 (a), *supra*, as modified by the British Trade Agreement, is sustained.

Judgment will be rendered for the defendant.